**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| RONALD BELL, | ) | |
| | ) | |
| MERLIN CLARK and MARCIE CLARK, | ) | Case No: 1:11-cv-01733 |
| | ) | ASSAULT AND BATTERY |
| HARBEE KREESHA | ) | INTENTIONAL INFLICTION |
| | ) | BREACH OF CONTRACT |
| | ) | AMERICANS WITH DISABILITIES ACT |
| MOHSEN ALSALEH | ) | BREACH OF COVENANT OF GOOD |
| | ) | FAITH AND FAIR DEALING |
| NICKY POOL | ) | **Jury trial demand** |
| | ) | |
| CHRISTINE HOLGUIN-LUGE | ) | |
| | ) | |
| individually and on behalf of their | ) | |
| spouses and families, and on | ) | |
| behalf of those similarly situated | ) | |
| persons, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY CO., | ) | |
| AKA CNA GLOBAL INSURANCE, | ) | |
| D/b/a CNA INSURANCE COMPANY, | ) | |
| | ) | |
| KELLOGG-BROWN & ROOT, | ) | |
| LLC, AKA KELLOGG BROWN | ) | |
| & ROOT INTERNATIONAL, AKA KBR | ) | |
| TECHNICAL SERVICES, KBR, | ) | |
| INC., AKA KELLOGG BROWN & | ) | |
| ROOT, | ) | |
| | ) | |
| RONCO CONSULTING, | ) | |
| | ) | |
| WACKENHUT SERVICES | ) | |
| INTERNATIONAL, | ) | |

1

|                                             |     |
| ------------------------------------------- | --- |
| GLOBAL LINGUIST                             | )   |
| SOLUTIONS, LC,  (GLS)                       | )   |
|                                             | )   |
| THE KHUDAIRI GROUP,                         | )   |
| DBA KHUDAIRI TRADING AND                    | )   |
| CONTRACTING COMPANY (KTCC),                 | )   |
|                                             | )   |
| Defendants.                                 | )   |

**THIRD AMENDED COMPLAINT FOR DAMAGES
AND DECLARATORY AND INJUNCTIVE RELIEF**

I. PRELIMINARY STATEMENT

Plaintiffs, individually and on behalf of all persons similarly situated, for their complaint allege:

1.      This is an action for damages under tort claims and contract claims: (1) breach of contract (Nicky Pool); (2) tortious breach of covenant of good faith and fair dealing (Nicky Pool); (3) the common law of outrage (Intentional Infliction of Mental and Emotional Distress); and (4) the Americans with Disabilities Act, 42 U.S.C. 12111.  It arises out of American and foreign contractors who performed services on behalf of the United States working for companies with contracts for security or logistics in Iraq and Afghanistan during the Operation Enduring Freedom and Operation Iraqi Freedom campaigns.

2.      Many of the individuals who are citizens of the United States who are named plaintiffs and putative class representatives, as well as similarly situated citizens of the United States, were terminated from their employment after being disabled by their injuries or occupational diseases covered under the DBA.  Others were retaliated against in a variety of

2

ways relating to their employment and benefits and conditions or terms of employment.  These

disabling conditions affect major life activities such as working, walking, breathing, using hands

and legs, back and other bodily conditions qualifying as disabilities within the meaning of the

Americans with Disabilities Act.

<u>II. JURISDICTION AND VENUE</u>

3.      This Court has subject matter jurisdiction over the asserted claims under 28

U.S.C. § 1331 (Federal Question), under 42 U.S.C. § 12112 (ADA) for discrimination in terms,

benefits, and conditions of employment, medical examinations, and hiring and firing, as well as

under the Class Action Fairness Act, 28 U.S.C. § 1332, in that  the estimated damages involved

in United States claims will exceed $5,000,000 and the parties to this action are residents of

different states because there are damages in excess of $10,000 exclusive of penalties, interest,

punitive damages, and attorneys fees.   In addition there is complete diversity of citizenship of

the parties under 28 U.S.C. 1332, and the amount in controversy for each Plaintiff exceeds

$75,000.  The court has supplemental jurisdiction over the federal common law or state law

claims for fraud, bad faith insurance practices, outrage, and deception in trade practices.  The

Court has personal jurisdiction over the Defendants because each and every defendant is present

and transacts business in the District of Columbia through DBA insurance and federal

contracting for work in Iraq, Afghanistan and other foreign countries with defense bases, with

the Department of Defense, the Department of State and other entities and subdivisions of the

United States government, some of the Defendants have their headquarters in the District of

Columbia, and Defendants generally do business in the District of Columbia through government

contracting, lobbying, and testimony before the U.S. Congress on DBA and other subjects.

Furthermore, many of the acts and omissions by Defendants were made here or had effects in the

District of Columbia, including making representations to Claimants and their Counsel in the

District of Columbia, attending hearings in the United States Department of Labor, Office of

Workers Compensation Programs, and Office of Administrative Law Judges, as well as Benefits

Review Board, located and managed in the District of Columbia, regarding Plaintiffs and those

similarly situated.  Many of the acts complained of had effects in the District of Columbia or

were made into the District of Columbia, including predicate acts, representations of Defendants

to committees of the United States Congress, as well as through representatives of Defendants in

the District of Columbia, through attorneys located in the District of Columbia, through mail,

wire, and banking that came to the District of Columbia.  Defendants intended or reasonably

foresaw that the acts would have effects in the District of Columbia.

      4.     Venue is proper in the United States District Court for the District of Columbia

under 28 U.S.C. § 1391(b) and (c).  All of the Defendants transact business in the District of

Columbia, maintain offices, or enter into government contracts and engaged in misrepresentation

and fraud to the DOL located in the District of Columbia, as well as misrepresented to the United

States Congress in answers to questions concerning the malfeasance in this complaint and

investigations into their repeated malfeasance regarding contractors who are injured and

mistreatment of them in Iraq and Afghanistan and elsewhere overseas, as well as in litigation

before the Department of Labor, OWCP or OALJ.  Many of the predicate acts of termination,

misrepresentation, mail and wire fraud, and other acts were done into the District of Columbia,

done in the District of Columbia or were made to representatives of Plaintiffs and those similarly situated in the District of Columbia, either in person or by telephone, fax or U.S. mail.  Plaintiffs believe and are informed, and thereon allege, that the banking transactions Defendants relating to the claims in this case, of depositing money through the depository system and wire system both domestically and internationally also had effects in the District of Columbia.  Defendants intended or reasonably foresaw that the acts would have effects in the District of Columbia.

### III.  PLAINTIFFS

5.      Plaintiffs described below are citizens of the United States who individually and on behalf of all individuals similarly situated who worked for defendants, work for defendants or will work for defendants on an American base or under contracts with the United States (or subcontracts with respect to such contracts) overseas, who have been denied benefits, subjected to the harm described herein, or been prevented through ruses and various fraudulent enterprises from accessing required benefits, and their families have likewise been damaged by these intentional and malicious actions.  One of the Plaintiffs described below is a foreign national from South Africa who was denied pay under an agreement with Continental Insurance Company that caused loss to her and her business as described below.

### IV.  DEFENDANTS

6.      Continental Casualty Company is a subsidiary of CNA Financial Corporation and controls CNA Global Insurance and CNA Insurance Company.  It is an insurance company that writes Defense Base Act (DBA) insurance and has contracts with the United States for DBA insurance through the Army Corps of Engineers and subcontracts with government contractors to

provide DBA insurance for services overseas. Continental Casualty Company's registered agent is Corporation Service Company. Corporation Service Co.'s address is 1090 Vermont Avenue N.W., Washington, D.C. 20005.

7.     Defendant Kellogg-Brown & Root, Inc. aka KBR Technical Services, aka Kellogg Brown & Root LLC, has extensive government contracts in Afghanistan and Iraq that employs individuals who are covered by insurance under the Defense Base Act. KBR's registered agent is Capitol Corporate Services, Inc., 1090 Vermont Avenue N.W., Washington, D.C. 20005, Kellogg Brown & Root's registered agent is Capitol Corporate Services, Inc., 1090 Vermont Avenue N.W., Washington, D.C. 20005. They owned an off shore company called Service Employees International, Inc, used as a shell to employ individuals in all of its government contracts with the United States with the above entities. Together, they billed and collected from the United States in excess of 20 billion dollars under the LOGCAP contracts in Iraq and Afghanistan, employing over 50,000 employees.

8.     Ronco Consulting Corporation is a commercial mine action, ordinance disposal, and security company, owned by G4S. Ronco's registered agent is Corporation Service Company. Corporation Service Company's address is 1090 Vermont Avenue, Suite 430, Washington, D.C. 20005. Ronco has its headquarters in the District of Columbia and has extensive contracts with the United States Government including with the State Department and USAID in the District of Columbia.

9.     Wackenhut Services Incorporated is a security firm owned by G4S, which bought Ronco Consulting, and engages in various services under contracts with the United States

government overseas.  Wackenhut's registered agent is Prentice Hall Corporation System, Inc. Prentice Hall's address is 1090 Vermont Avenue, Washington, D.C. 20005.

10.      Global Linguist Solutions, LLC (GLS) is owned by DynCorp and AECOM Government Services and provides linguists for translation and interrogation in Iraq and Afghanistan and for other purposes in the United States under contracts with the government of the United States.  It can be served at its corporate headquarters at 3190 Fairview Park Drive, Suite 1000, Falls Church, VA  22042.

11.      Defendant The Khudairi Group is a holding company in the United States that owns various government contracting companies that enter into contracts with the United States to provide services in Iraq for government and infrastructure, operations, heavy machinery, and other services on bases in the United States and in Iraq.  The Khudairi Group owns and operates Khudairi Trading and Contracting Company (KTCC), which provided services in Iraq for Kellog Brown & Root, Inc (KBR) as described more fully below in Baghdad, Iraq, and may be served by serving the Khudairi Group at 1616 S. Voss, Suite 675. Hosuton Texas 77057.

## V.  FACTUAL & LEGAL ALLEGATIONS

### Ronald Bell

(against Kellogg-Brown & Root defendants)

72.      Ronald Bell had worked as a truck driver and sheriff's deputy in Texas.  He went to work for Halliburton, KBR, SEII, in 2004, and worked as a combat truck driver for KBR. During his time in Iraq, traveling to and from military bases and compounds, he was attacked on numerous occasions by rockets, mortars, roadside bombs, IEDs, and small arms fire.  He was

involved in at least seven roadside bomb blasts, had several friends die in Iraq, and felt threatened with his life on numerous occasions, witnessed gruesome scenes, and learned of deaths of fellow drivers reported to him in camp.  He saw carnage and mayhem on the roads. The real employer was KBR, and SEII was imposed unilaterally as an offshore ruse to avoid paying taxes.  KBR recruited, trained in their Houston offices, entered into the government contracts under which all work was performed and payment made, and employed Plaintiff and controlled the functions of the employees such as Plaintiff.

73.     In or around 2008, Mr. Bell was stuck on the head by a heavy bolt that broke free from an axle on a truck he was working on for KBR in Iraq.  This blow caused Mr. Bell to lose consciousness and bleed profusely from the head.

74.     On August 14, 2009, he injured his knee in camp while dismounting from his bunk bed where KBR had him sleeping.  He felt his knee pop and could not walk.  He sought treatment and was sent home to Texas at the end of August, 2009, to receive and did receive surgery on his left knee for medial meniscus tear.

75.     On his return to the United States, KBR and its insurance carrier, AIG, immediately began to discriminate against him, withholding his personal goods, threatening to sell them, terminating his medical benefits, and failing to send him COBRA notices timely, and causing great hardship to him and his wife.

76.     As a result of his job with KBR in Iraq, Mr. Bell encountered numerous life and death situations, concussion and IED types of explosions, witnessed loss of life, and had to go through combat conditions with gunfire and potential for loss of life and extremes of survival.

This has left him with severe injuries in addition to his knee injury on the job.  He has experienced PTSD symptoms for some time, including flashbacks, nightmares, reliving of the severe incidents in which he was involved or witnessed firsthand, and enhanced startle response as well as heightened anxiety and difficulty sleeping, increased anger response and shortened fuse, difficulty concentrating or coping and focusing on tasks.  All of which makes it more likely he has also experienced blast injuries, or Traumatic Brain Injury (TBI).

77.     Through his attorney, on December 17, 2009, Mr. Bell informed KBR of his PTSD and TBI and demanded treatment for PTSD and testing for TBI.  He began seeing a psychologist who diagnosed him as having classic PTSD as a result of his encounters in Iraq for KBR.

78.     Within ten days of receiving that demand at KBR headquarters, on January 6, 2010, two men in suits arrived at Mr. Bell's home in a White Escalade.  They parked on his property, approached him on his porch, and identified themselves as being from defendant KBR (Halliburton) from Houston where the company's headquarters are located.  They told him he needed to drop his "lawsuit or else."

79.     Mr. Bell said they would need to talk to his attorney.  They told him no attorneys needed to be involved, that he needed to drop his lawsuit against KBR or else.  Mr. Bell felt intimidated and threatened by these men and believed some physical harm might befall him and his family.  He told them he needed to go inside to get his attorney on the line, but could not, and when he came back outside his dog, a pit bull, followed him out,  and the men got in their Escalade and left.  Mr. Bell called the sheriff's department of Lubbock who came and took a full

report for assault and threats by the two employees of KBR. This report was supplied to KBR's

legal division by counsel for Mr. Bell. KBR never denied this occurred but instead wrote to Mr.

Bell's attorney to identify a lengthy alternative dispute resolution policy which it supplied to Mr.

Bell's counsel.

80.     Since then Mr. Bell has had a second operation on his knee and has had extensive

physical therapy. He cannot walk on the knee without it giving out. In April, his orthopedic

surgeon recommended he have a total knee replacement. AIG subsequently accused Mr. Bell

through its case manager of being addicted to pain medication, that there was nothing wrong

with him but "arthritis" and pressured Mr. Bell's treating orthopedic surgeon with finding he had

reached "maximum medical improvement" (MMI) and should be rated and released. This MMI

finding is necessary for AIG to cut off benefits.

81.     AIG refused to pay for the knee replacement and sent him to a hired doctor to

produce an DME report, that stated he did not need a knee replacement. AIG cut off his benefits

and refused any further knee therapy or benefits for PTSD or any medication or therapy.

82.     Mr. Bell brought the matter for informal conference before the Department of

Labor who ordered a separate independent exam by DOL's doctor who determined that he did in

fact need a knee replacement. The DOL recommended as well that AIG and KBR provide for

him to be treated at their expense for PTSD and appropriate medication and testing. To date,

KBR and AIG have not complied.

83.     The company has refused any payment for testing or treatment of PTSD or TBI,

refused to pay for medications for sleeping, anti-psychotic, and anti-anxiety medication, and has cut off his TTD disability benefits, subjecting him and his wife to potential loss of their home.

84.     While he was being treated on medical leave, and while the company was telling him he would be reinstated after his disability when his injuries ceased, the company terminated his employment.  Under the written agreement, when he experiences a disability from an on the job injury, which KBR acknowledges on the knee, he is entitled to retain his insurance and other benefits with the company unless and until it is medically determined that he is unfit to return to duty once he is treated and reaches maximum medical improvement.  Even then, under the Americans' with Disabilities Act, the company is obligated to make reasonable accommodations in adjusting his job or placing him in available jobs that fit his limitations.  Nevertheless, KBR and AIG never offered to accommodate him, and tried to and has interfered with his medical treatment and has refused him any treatment for PTSD and TBI and instead has threatened him to drop that claim and caused great harm to him, including assaulting his integrity, accusing him of drug addiction, subjecting him to financial problems and loss of his home, and pressuring his doctor to find him at MMI.

85.     For ten months he has been without any pay or treatment for his knee or PTSD, depression, and possible brain injury, and has been threatened with loss of his home where he and his wife live, been unable to pay for medications or therapy.  This worsened his condition with regard to his knee, pain, and his PTSD worsened with no treatment.

86.     During this time, Mr. Bell had no insurance and no benefits under the DBA and was forced to go to the emergency room in Lubbock in order to deal with his pain, anxiety,

PTSD and brain injury problems.  He has incurred medical bills that he cannot pay and is being

pursued in collection.  He was forced to pay out of pocket for neuropsychiatric evaluation that

determined he has severe PTSD, depression, and traumatic brain injury and loss of

consciousness.  He has also had to incur out of pocket expense for medications which he can

only purchase irregularly, and to see his psychologist, Dr. Richard Wall, infrequently because he

cannot afford sessions.  The total out of pocket expenses for medical bills, travel and medication

is approximately $30,000.

86.     Following his deposition in April 2011 in Dallas, Texas, AIG and KBR through

their counsel stated they would recommend paying his temporary total disability compensation

(TTD) but failed to do so for two months, and then notified Mr. Bell they were starting his TTD

pay, had paid or were going to pay, and it took some six weeks to actually pay Mr. Bell anything.

AIG authorized him to go back to his orthopedic surgeon who recommended total knee

replacement in the spring of 2010, but which AIG refused despite a second opinion being

ordered by the Department of Labor.  As of August, 2011, they still refused any treatment or

medication for the PTSD, depression, and any testing for TBI despite the blow to Mr. Bell's head

on the job in Iraq, and his loss of consciousness other symptoms of memory loss and difficulty of

concentration showing evidence of neurologic damage and possible TBI.

88.     As a result of KBR and AIG's actions, retaliation, withdrawal of TTD payments,

accusations of drug addiction, and other improper actions, they have inflicted injuries on Mr.

Bell and his wife, Cynthia Bell, worsening his psychological, physical and emotional and

financial conditions, and harming their marriage.  These actions were done to harm Mr. Bell and

his wife, or done with reckless disregard for the harm their actions would take, after being warned repeatedly of such.  Mr. Bell does not seek any amounts compensable under the DBA in this action.

### Merlin Clark

(against Ronco and WSI)

89.     Merlin Clark is a former US Navy Explosive Ordnance Disposal and Demining (EOD) expert, with a background in this for his last eight years in the Navy. Mr. Clark worked for Ronco Consulting, which is now owned by Wackenhut Services International (WSI), under contracts in Bosnia and elsewhere since 1999.   As a supervisory Senior EOD employee for Ronco, Mr. Clark was selected to initially provide field management of and later provide overall management of the unexploded ordnance/bomb disposal activities after the invasion of Iraq for RONCO under contract to the United States Department of State.  He was an experienced and respected EOD expert who was selected for State Department Humanitarian work in post-war zones such as Bosnia, Kosovo, Eritrea and Iraq.  RONCO mobilized the Chief of Party for the Mozambican clearance force, a Mr. Leslie Brown, as the Task Leader with the understanding that Mr. Brown would demobilize after 45 days and Mr. Clark would assume the duties of Task Leader and Mr. Clark's position as field manager would be backfilled by another qualified (individual that has successfully completed EOD training in a first world military) and experienced EOD professional from the then current RONCO cadre.  Just prior to Mr. Brown's departure from Iraq, Mr. Clark contacted his supervisor, Mr. Lawrence Saiers (RONCO's Vice President for Strategic Planning), about the upcoming vacancy for a field manager.  Mr. Clark

submitted a list of RONCO individuals qualified to fill this position.  RONCO ignored the request and operational requirement for a EOD qualified replacement and instead sent a demining advisor whose limited operational field experience consisted of observing demining activities performed by the Djiboutian military for 2 years, and who had no EOD training or background.  As explained to Mr. Clark by Mr. Saiers, this move was to expand the (unqualified) individuals' field experience.  Mr. Clark then requested a third (qualified) individual to assist in the field (as his Number 2) but this was denied and he was told to "make it work".   Mr. Clark protested that due to the size of the clearance force, the hazards of the munitions encountered and size of the task sites that another qualified EOD person was critical to project safety and this was ignored by RONCO.  At this point, Mr. Clark had 56 Mozambique nationals, 1 American Dog Handler Trainer and 1 unqualified field manager under his direct supervision as Task Leader. Prior to this, the crew was split between Mr. Clark and Mr. Brown (also EOD qualified) which had proven to be an adequate level of supervision for safe clearance operations.

90.     On July 7, 2003, claimant was overseeing the clearance and disposal of (US) M42 submunitions that had been launched against an unknown target at a location 12 kilometers north of Baghdad.  The clearance team worked the site for 2-3 days and was finally made aware that this area had been classified as a "Red Zone" by the US Military due to an incident where, days before, two armed US Army Soldiers had been abducted and killed decapitated by local Sunnis. Mr. Clark met with the US State Department representative, Mr. Harry McCloy, and requested that security for the clearance activity be provided by the US Military and this request was passed on to Command Joint Task Force (CJTF) 77 (in charge of Iraq at that time) and the

request was granted.  The promised security detail did not show at the predetermined meeting

point during the following 2 days on the site and the team returned to the camp and attended

training.  Mr. Clark spent the morning frantically trying to locate the security detail and oversee

the clearance activity at the same time.  Because of Ronco's failure in providing a second

qualified EOD person, Mr. Clark was very limited in the duties he could assign to the unqualified

Number 2 man and this, combined with his concern with the safety of his men over the

deteriorating security situation resulted in a tremendous amount of stress on Mr. Clark due to 2

prior incidents; Mr. Clark and 6 Mozambicans were fired upon on June 28th, 2003 by the US

Army while conducting authorized demolitions and on June 30th, 2003 when Mr. Clark and his

Number 2 were nearly shot at close range by a semiconscious U.S. Army soldier gate guard

because they drove past a sign in Arabic saying to stop at a checkpoint at Camp Dogwood,

Mr. Clark was not totally focused on the task at hand when he began gathering the unexploded

M42 submunitions on this day.  At one point he picked up a submunition, tripped on the hard

baked rowed earth in the farm field and dropped the munition which detonated on impact.  He

was violently thrown up and back by the pressure wave from the explosion, then down to the

ground landing on his head, neck, and back on the hard and dried rows.  When he regained

consciousness he looked down and saw his left foot at an odd angle.  The bomb had crippled him

and he began to apply pressure to stop the profuse bleeding until he could be brought back to

base by medevac helicopter.

> 91.    It took an hour for a medevac to pick up Mr. Clark and fly him to Camp Dogwood

15

Field Hospital.  He was immediately sent to Landstuhl due to the critical nature of his wounds.

While there he was administered highly neurotoxic antibiotics at very high doses for MDR

Acinetobacter baumannii.  He was left there for nearly a week without medical evacuation being

provided by Ronco or CNA, and neither did Ronco explain to Mr. Clark or his wife, Marcie

Hascall Clark, anything about the DBA or its benefits.  Mrs. Clark became involved early on in

her husband's care and treatment and became a caretaker for the last eight years.

92.     Having been abandoned by the Employer/Carrier the military medevaced him to

Walter Reed Army Medical Center.  At Walter Reed treatment continued for MDR

Acinetobacter baumannii.  He received continued debridement of the wounds and MDR

Acinetobacter baumannii was cultured from his wounds.

93.     The blast had destroyed Mr. Clark's left shin, the circulation to his foot was

critically diminished.   His tibia was left intact but broken,  and  his fibula was left with a huge

hole and bone fragments, nerves,  tendons were destroyed.  In order to keep his foot, and

reestablish circulation, the surgery team had to establish a vascular pulse.  The surgeon at Walter

Reed, Dr. Jorgenson, took a large flap of muscle from Mr. Clark's back, a Lat Flap.  This muscle

was connected to the knee by microsurgery and wrapped around to the leg and foot.  His right

arm had a 99% severed ulnar nerve.

94.     Part of the flap did not take, necrosis set in.  This was due to Mr. Clark not being

transported within the first seven day window, being abandoned at Landstuhl Air Base for about

a week.  Brigadier General John Wilkinson, a Ronco VP at the time, had to intervene at Walter

Reed when Mr. Clark arrived as no one had made arrangements for him to be there.  This delay

caused a great deal of stress and medical complications for Mr. Clark and Mrs. Clark.  The left

leg was the most pressing and life threatening injury initially.  All energies went into dealing

with the leg, saving the foot and leg, and reestablishing blood flow and pulse.

95.     Mr. Clark had multiple traumas from the blast, including to his head, hearing,

hands, right arm, back, neck, and very serious complications from the life threatening MDR

Acinetobacter baumannii and the highly neurotoxic drugs used to treat it.  These neurotoxic

drugs were used in the highest possible doses effectively bathing Mr. Clark's freshly compressed

brain cells creating a hostile environment for healing

96.     Leishmaniasis, a protozoan blood born parasite from the bite of a sandfly in Iraq,

known to be an opportunistic pathogen endemic to Iraq, attacked the reconstruction of the leg but

it was not addressed by any of Mr. Clark's doctors until months later, well after the initial attack.

Leishmaniasis is a life-long infection, and much like malaria, it can be treated but there is no

cure.  Leishmaniasis can remain dormant in an otherwise healthy person for up to 20 years

before recurring.  Mr. Clark's leishmaniasis remains active after eight years all around the

reconstruction of his lower left leg.

97.     Shortly after he was released from the hospital a second, and even more

neurotoxic drug was added to his treatment.  This drug is only legal to use for 14 days but was

prescribed for six weeks.  He had a serious ototoxic reaction to this second drug which caused

permanent damage to his eighth octal nerve resulting in permanent balance and coordination

problems. He also was evaluated and found to have hearing loss, dizziness, and tinnitus from the

blast.  He underwent extensive physical therapy, both in his home as well as on an out-patient basis.

98.     His leg brace and leg injuries, including the severe nerve damage caused a loss of his ability to run, to walk properly, to have balance and coordination,  or to lift his foot.  He has had to wear a leg brace for years and will have continuing orthopedic and orthotic needs for life. He had drop foot for which he needed operations, and it still gives him problems.  He has severe back and neck problems, ulnar nerve damage in his right arm, and difficulty performing basic tasks as a result.  He is right hand dominant and has trouble gripping and holding things.   Basic daily tasks, much less work,  are much more challenging for him.  He has issues with travel, due to edema in his leg, back and neck pain, range of motion, and stress.  He is at increased risk for thrombosis, clots, heart attack, and peripheral vascular disease due to the reconstruction of his leg and other multiple operations.

99.     This event has had a profound effect on his work, personal life, and his family.  The medical and psychological treatment and travel alone consume massive amounts of time over the last seven years for which they have never been compensated.

100.     In addition, as a result of this traumatic explosion, Mr. Clark suffered a traumatic brain injury (TBI), diagnosed by Dr. Gary Weiss and by Dr. Walter Afield, an expert in neuropsychiatric trauma.  He has had a scan of his brain showing a traumatic brain injury.   Mr. Clark also developed psychological symptoms of stress, depression, reliving of the incidents, PTSD and related problems.  Mr. Clark has nightmares and intrusive recollections about the traumatic event, as well as withdrawal and avoidance issues.  This has also been intensified as he

has had to live and relive it constantly through the medical, psychological, and psychiatric treatment and because of the elongated recovery process, infections, and issues that have gone untreated.  He has a grossly disfigured leg.  He has extensive scarring on his arm and back, and continuing pain throughout his body from his multiple injuries and operations.  He will likely require additional operations during his life due to the progressive problems with his leg, back, and neck.  He has hearing loss from the explosion and ototoxic drug reaction, leishmaniasis infection, and life care needs for the rest of his life.

101.    Mr. Clark was offered an office administrative job with Ronco and went back to work in November, 2004.  He worked in Ronco's offices in Washington, DC, and from his home in Melbourne, Florida.  He was making less than half of what he would have been making in Iraq had he not been injured and unable to continue in his usual occupation.  His new administrative job was to write proposals for contracts.  He had restrictions from his doctor that Ronco/WSI agreed to accommodate.

102.    The physical and psychological disabilities have caused Mr. Clark to have permanent memory loss, concentration and other mental processing problems.  This created undue stress and difficulties at work because Ronco demanded that he travel and work beyond his doctor's restrictions.

103.    Over the course of seven years until his termination by Ronco/WSI in 2010, CNA and Ronco, acting through their agents and attorneys, repeatedly misrepresented to the U.S. Department of Labor officials concerning paying for medical treatment for Mr. Clark's numerous and life threatening medical conditions.  They refused to pay for medications,

psychological and psychiatric treatment prescribed by his psychologist and neuropsychiatrist, back and neck treatments prescribed by their neurologist, orthotic devices as prescribed his the orthopedic physician, treat TBI as diagnosed by his neurologist, hearing aids as prescribed by his otolarynologist,  or test for or treat his leishmaniasis.

104.     Previously in 2008, CNA offered to settle the disability and medical claims of Mr. Clark.  They gave particular numbers and figures, and the Clarks were prepared to get CNA out of their life and settle.  When the settlement stipulations were produced by CNA's attorney, however, the figures were completely different and had the Clarks owing CNA, and Mr. Clarks medical for life was not included.

105.     CNA has made it so difficult to obtain any prescriptions or medical treatment, that the Clarks have had to pay for it out of pocket, and have expended thousands of dollars of their own money for travel, co-pays with Blue Cross Blue Shield, and have been forced to forego many treatments and therapies Mr. Clark needed because of the lack of funds.  All the while, CNA would tell and continues to tell Judges and officials of the Department of Labor that it has authorized medical treatment and payment for prescriptions, orthopedic devices, hearing aids, etc.  Yet Mr. Clark has no hearing aids, no orthopedic devices, compression stockings, or other items CNA claims it has authorized.  Ronco has worked closely with CNA, and they have blamed Mr. Clark and Mrs. Clark for all of their misrepresentations, fraud, and harassment.

106.     Since the beginning, Ronco and CNA used a variety of misrepresentations, devices, and ruses, to prevent proper payment to Mr. Clark and Mrs. Clark for his treatment and her care of her husband.  They have interfered with their doctors' treatment, created havoc with

nurses, provided nurses that were not qualified, failed to approve arranged surgeries without notice, sent the Clarks on long expeditions for DMEs that are abusive and harassing, only to find out the doctors will not see them for reasons of not bringing films or medical records which were not the responsibility of the Clarks to bring.

107.    Representations made above occurred in July, August, and September through CNA and Ronco counsel to counsel for the Clarks in Washington, D.C. and the predicate acts of misrepresentation, were sent from CNA's representatives to the Clarks' counsel in Washington, D.C. repeatedly from July through October, 2010.  On August 19, 2010, CNA and Ronco's counsel appeared in Washington, D.C. for a settlement hearing before Judge Woods of the Office of Administrative Law Judges.  During that conference, CNA and Ronco through their counsel repeated the misrepresentations concerning lack of payment, claiming they had paid all authorized medicals, they had authorized medical treatment for Mr. Clark for his orthopedic, neurologic, psychological, hearing, leishmaniasis, and other problems, which in fact they never had, and they continued to make said misrepresentations in Washington, D.C., while the Clarks were listening on the telephone.

108.    To date, Ronco and CNA have conspired together to fire Mr. Clark after he finally settled his disability claims.  At the settlement conference with the Administrative Law Judge in August, 2010, Ronco and CNA's attorney represented that Mr. Clark was a very valued employee.  They insisted that his continued earnings in a job they created for Mr. Clark after the explosion and injuries in Iraq, establish his retained earning capacity.  Ronco and CNA communicated back and forth regarding waiting until a settlement was reached to fire him.  Prior

to the stipulated agreement being signed, on September 1, 2010 Ronco had Mr. Clark fly to Washington DC where he was notified that he was laid off effective September 30, 2010 due to his disabilities, but through e-mail were advised that it might affect the settlement of the case.

109.    By September 30, 2010 Mr. Clarks work telephone was disconnected, his clients were turned over, and he returned Ronco's property as requested.  Mr. Clark contacted Ronco the following Monday October 4th in regards to his final paycheck, expense reimbursement, severance package, vacation pay, and 401K which he was denied. On October 8, 2010 CNA finally signed the previously agreed to stipulations.  Mr. Clark was forced to hire an attorney to try to collect these benefits. Ronco refused to pay the severance unless Mr. Clark signed a ridiculously broad confidentiality agreement that he could not in good conscience sign.

110.    Merlin Clark filed a claim with the Equal Employment Opportunity Commission less than 180 days following his termination for Ronco's violations of the Americans with Disabilities Act in failing to reasonably accommodate his known disabilities affecting major life activities, and for discrimination under the ADA for terminating him due to his disability and pursuit of settlement of his DBA claims.  The EEOC issued a Right to Sue letter on June 28, 2011 which was received by Mr. Clark on June 29, 2011.

111.    The actions of Ronco and CNA have harmed not only Mr. Clark and set him back in his care and treatment, they have made it very difficult for him to be treated due to windows for testing and treatment for leishmaniasis, TBI, psychological injuries, PTSD, back injuries, and neck injuries.  Delays from the beginning due to Ronco, and later continuing with CNA, have caused increased stress, difficulties in their family life, and caused damages to Mrs. Clark and

their daughter.  Ronco did these actions knowing the harm that was and would be caused to Mr. Clark and to his family.

112.    The actions of Ronco have had a profoundly detrimental impact on Merlin Clark, have caused financial hardship on him and his family, and have worsened Merlin's physical and psychological conditions.

### Harbee Kreesha

(against Global Linguist Solutions)

113.    Harbee Kreesha is an American Citizen who was born and raised in Jordan and worked as a translator for Defendant GLS, on classified projects attached to the US military and intelligence services in Iraq, in conjunction with Iraqi intelligence.  He worked for GLS for six months in 2009, from June until December of 2009, going on missions and translating for interrogations of high value targets of Al Qaeda or other terrorist organizations in Iraq, hostage negotiations, weapons caches from informants, and other missions.

114.    On many missions, he and the convoys in which he was traveling were attacked by insurgents or terrorists, or when he arrived at the mission sites around Baghdad, he would be attacked by arms fire, roadside bombs, mortar fire and other means.  He witnessed numerous injures, mayhem and death, including death of Americans and Iraqis with whom he had worked closely.  He was required to participate in interrogations in which physical torture and killing were perpetrated in the presence of U.S. military and intelligence officials.

115.    These experiences altered Mr. Kreesha's personality and traumatized him,

resulting in PTSD, depression, anxiety, extreme anger and violent ideations, causing him to become involved in many physical fracases, fights, and disabling him from work.

116.    On or about December, 2009, Mr. Kreesha was bitten by a sandfly and contracted Leishmaniasis and experienced lesions on his calf and hand, vomiting, dizziness and stomach problems.  He was flown to Germany for Amphotericin B treatment in Germany that was started in Bahgdad and finished in Iowa on his return to the United States.

117.    When Amphotericin did not stop the Leishmaniasis infection and lesions, his doctors and Centers for Disease Control (CDC) recommended he receive a course of Pentostam intravenously.  Pentostam was administered at the University of Iowa Medical Center in Iowa City, Iowa by Dr. Loreen Herwaldt.

118.    Mr. Kreesha was treated, paid for by Zurich Insurance.  The University of Iowa medical center hospital and Dr. Herwaldt diagnosed him with additional problems stemming from the leishmaniasis, including nerve damage to his leg, stomach and intestinal problems, neuropathy, veinous damage, lymph damage, blood clots, edema, pain, and reopening of the calf lesion and seeping, reinfection or activation of the leishmaniasis causing difficulty in walking, swelling in his leg, wearing of a leg brace or use of crutches, which continues to this day.  He also has to wear a compression stocking due to chronic swelling in his left calf that affects his walking and  makes him unable to move around or stand for long periods.

119.    His doctor at University of Iowa and his wife noticed angry and strange behavior that led the doctor to refer him to a psychiatrist at the University of Iowa who diagnosed him with PTSD and depression.  He was also referred to a psychologist and has been treating for

PTSD and depression due to his experiences in Iraq.  All of this occurred in June or July of 2010.

Mr. Kreesha has had several encounters with others that resulted in physical fighting due to his

PTSD and Depression.

120.    Mr. Kreesha used part of his TTD compensation from Zurich and GLS to provide

for his sick mother in Jordan.  She became hospitalized with kidney failure and needed a kidney

transplant.  Mr. Kreesha informed his case worker at Zurich Insurance he had to travel to Jordan

to help his mother and possibly provide a kidney.  He was given no indication this would be a

problem.  Suddenly, Zurich Insurance stopped paying Mr. Kreesha's medical bills and TTD,

stating that it was because he left for Jordan and if he could travel to Jordan, he could work.

121.    As a result of this stoppage of TTD, Mr. Kreesha

could no longer provide for his mother in Jordan and his family, his wife and he  suffered great

emotional and psychological distress.

122.    Later during proceedings before the Department of Labor, Zurich and GLS took

the position that they stopped his benefits because Mr. Kreesha had disappeared and they could

not contact him.  This was utterly false, and Zurich had been informed by Mr. Kreesha and his

attorney more than once over a two month span, that Mr. Kreesha had explained why he was

leaving the country, and his ability to travel in no way cured him of his leishmaniasis or his

PTSD and depression, and his violent and angry outbursts.

123.    GLS fired him in July 19, 2010 by letter for not returning from leave.  Mr.

Kreesha filed a complaint with the EEOC for discrimination under the Americans with

Disabilities Act (ADA) and obtained a right to sue letter on August 28, 2011.  Mr. Kreesha

continued to be a qualified translator and could have worked as a translator for GLS in a modified or United States based job.

124.    As a result of what Zurich and GLS did, Mr. Kreesha became very violent and wanted to kill the representatives of GLS and Zurich and planned to do such during his deposition scheduled for April of 2011.  Mr. Kreesha's doctors believed the threat was credible and warned counsel for Mr. Kreesha not to be present in the room with him for deposition.

125.    The deposition of Mr. Kreesha was taken by Zurich and GLS attorneys from New York City on July 27, 2011.  During that deposition, counsel for CNA and GLS taunted Kreesha about his personal threats conveyed in confidence to his doctors concerning the attorneys for GLS and CNA due to their withholding of compensation and treatment for no good reason.  The attorneys asked Kreesha why he wanted to do harm to them in a taunting and ridiculing fashion. Following the deposition, Zurich and GLS cut off any benefits relating to the PTSD and depression and decided to seek second opinions by "peer review" selected by the insurance company.  They cut off his payment for any medical bills, including ones they did not dispute for leishmaniasis and related reactions and conditions, and they cut off his medications for his psychiatric conditions, causing great setbacks and distress, and causing him to be unable to see his psychologist or psychiatrist for the appointments set.

126.    The actions of GLS and Zurich have caused increase of symptoms of Mr. Kreesha, harmed him physically and emotionally, and slowed down his recovery, and caused financial hardship to him and his family.

**Mohson Alsaleh**

26

(against Global Linguist Solutions)

127.    Mohsen "Mason" Alsaleh is an American Citizen who was born and raised in Jordan and went to work as a translator in Iraq for the US Department of Defense from 2006 to 2010.  He worked for Defendant GLS in Iraq from June 2008 until January 2010, on various projects attached to the US military in Iraq, going on missions translating and interpreting for US military personnel.

128.    On many missions, or when he arrived at mission sites around Baghdad, Anbar Province and Mosul, he and the convoys in which he was traveling were attacked by or witnessed mortar fire, snipers, road side bombs and suicide bombers.  He worked with the E.O.D. team looking for explosive devices and disposing of them.  He patrolled with military personnel among the Iraqi civilian population in various towns.  He witnessed numerous injuries, death, and mutilated bodies.

129.    On or about September, 2009, Mr. Alsaleh, along with a fellow GLS employee and a soldier were bit by a sand fly and contracted Leishmaniasis.  Mr. Alsaleh, experienced lesions on his neck and elbow.

130.    In September of 2009 he sought medical help for the lesions, not knowing what they were.  A US military medic gave him ointment for the treatment of spider bite.  The soldier who had a similar lesion was sent directly to a base for surgery and the lesion was cut out of his arm, stopping any chance of the parasite invading his body.   Mr. Alsaleh's lesions grew and worsened through October. Mr. Alsaleh could not seek help through assigned GLS medical personnel because there were none.  GLS had eliminated the position. GLS personnel were

supposed to have the right to seek medical help and treatment from US military medical staff and
facilities written into their military orders.  GLS had failed to do this for Mr. Alsaleh.   Mr.
Alsaleh was experiencing stomach aches, vomiting, and dizziness.  In October 2009, while on a
mission, an Iraqi doctor noticed the lesion on Mr. Alsaleh's neck, recognized it as Leishmaniasis
and told Mr. Alsaleh, this was very serious and he needed medical help right away.  In early
November 2009 Mr. Alsaleh contacted GLS to tell them the seriousness of his condition.  GLS
denied Mr. Alsaleh medical help.  Mr. Alsaleh approached US military officers for help. Around
Dec. 1, angry with the lack of support Mr. Alsaleh was receiving the US military intervened and
brought Mr. Alsaleh to an Army Doctor.  Mr. Alsaleh was prescribed and treated with
Fluconozole for approximately 28 days while still in Iraq and working.   The following reactions
to the fluconozole occurred:  frequent urination, collapse, pressure in chest, shortness of breath
and the lesions continued to worsen.  During this time the US military brought his case to a Dr.
Moody who specializes in Leishmaniasis at a base in Baghdad.  Dr. Moody demanded to see Mr.
Alsaleh.  GLS was notified and Mr. Alsaleh was medevaced to Baghdad by the US military on
December 23, 2009.  Dr. Moody biopsied the sites and tried to arrange for medevacing Mr.
Alsaleh to the states, to Walter Reed because his condition was serious.  GLS was not helping
and did not contact Mr. Alsaleh during the week he was in Baghdad. .The doctors were unable to
get the necessary paperwork to fly Mr. Alsaleh out because of the administrative errors in Mr.
Alsaleh's military orders.  Dr. Moody and the medic kept GLS informed via e-mail.  The doctor
told Mr. Alsaleh to continue the fluconozole for an additional week.  Mr. Alsaleh returned to his
base site in Northern Iraq to continue his fluconozole treatment and await the outcome of the

biopsies from Germany and the administrative corrections to his military orders regarding medical help.  The second week in January Mr. Alsaleh sent pictures of his worsening lesions to Dr. Moody in Baghdad.  Dr. Moody determined he must be medevaced to the United States immediately.  Somewhere around mid January 2011 Mr. Alsaleh was notified by GLS that he was to return to the United States for treatment.

131.    Upon his return to the United States, in the 4th week of January, he was contacted by Zurich insurance company and was told Zurich would be handling his case.  Mr. Alsaleh saw an infectious disease doctor who had little experience with Leishmaniasis, (one case in the past 17 years at the time), and put him on a course of Pentostam to address the Leishmaniasis infection.  GLS did not want him going to Walter Reed or any other Leishmaniasis experienced Medical facility in the Northern United States because of the cost of housing and transportation. Mr. Alsaleh experienced inadequate care during the Pentostam treatment.  The treatment was delayed for over month, the doctor went on vacation during his treatment, the Zurich case worker did not arrange for treatment sites as promised.

132.    A doctor noticed that Mr. Alsaleh was showing an irregular reading on his EKG, showing cardiac issues.  The doctors and Zurich ignored this.  When Mr. Alsaleh complained about his treatment and the competence of the Zurich case worker he was told that Zurich did not want to replace her because it would look bad on her record.  He was also told that he must go through her with any communication he had with Zurich. Mr. Alsaleh's Pentostam treatment was stopped half-way through because Mr. Alsaleh had an allergic reaction to it.  Therefore he was not treated.  After going on Pentostam. Mr. Alsaleh developed many other problems, related to

the Pentostam and Fluconozole, and possibly in part due to his exposure to pigeon droppings and burn pits while in Iraq.  These conditions included cardiac issues, chest pain and pressure, lung issues, shortness of breath and collapse, sleep disorder,  an inability to fall asleep or stay asleep, urological issues, frequent urination, fatigue, exhaustion, aches and pain throughout his body and recurring Leishmaniasis lesions.

133.    As a result of his Leishmaniasis, he has a blood borne parasite for life, and was treated with Pentostam and Fluconozole.  He had reactions to these drugs, and as a result of that and in combination with his Leishmaniasis and any lung issues from breathing in toxic substances in Iraq, has had shortness of breath, trouble sleeping, frequent urination, fatigue, and anxiety.

134.    From January, 2010 until September 2010, he received TTD disability checks every week in the amount of $1,224.66.  In May of 2010 he was told by his doctor there was nothing else she could do for him and that his recurring symptoms and overall feeling of poor health had no direct link to Leishmaniasis.  For treatment of his residual symptoms he would have to use his own insurance and see other doctors.  Mr. Alsaleh complained to the case worker about this and she said she would have to discuss it with her boss. Mr. Alsaleh never heard from Zurich again.  In May of 2010 Mr. Alsaleh sought medical help from another infectious disease doctor, who sent him to a cardiologist and then a lung doctor.  Mr. Alsaleh paid for all medical treatment with his own insurance.  The last doctor he saw suggested PTSD and ordered a sleep study.  Then Mr. Alsaleh's medical insurance ran out because GLS fired him in July of 2010 for not returning to work from medical leave.  During the first week of September 2010 Zurich

Insurance abruptly cut off his TTD benefits and refused to pay for any more medical treatment to address his continuing symptoms. Since that time, Zurich has refused him any benefits.  Thus his family has no means to provide for themselves and to pay the expensive health insurance (COBRA).  Zurich Insurance made representations to Washington, D.C. attorneys for Mr. Alsaleh in the District of Columbia, using mail and fax and telephonic transmissions, denying claims and committing other acts of fraud and bad faith, in 2010, as aforesaid.

135.    He was fired by GLS on July 19, 2010 for not returning from leave due to his Leishmaniasis and complications.  He applied for a job with GLS in December 2010 and was told he was a great candidate because of his experience and glowing recommendations.  He later was told his file had a "do not pursue, do not rehire" note on it.  The GLS recruiter found this odd and wanted to know from Mr. Alsaleh if he knew anything about that.  After that conversation the GLS recruiter would not answer Mr. Alsaleh's attempts to contact him.  He filed a complaint with EEOC for violations of the Americans with Disabilities Act in January 2011 and has requested a Right to Sue letter.  He received a Right to Sue letter on September 22, 2011 from EEOC.  Mr. Alsaleh continued to be a qualified translator and could have worked as a translator for GLS in a modified or United States based job.

136.    Mr. Alsaleh's experiences of being in a combat zone and seeing extraordinary suffering of victims of war traumatized him, resulting in undiagnosed traumatic psychological depression, anxiety, and sleeplessness.

137.    The actions of GLS and Zurich have caused increase of symptoms of Mr.

Alsaleh, harmed him physically and emotionally, and slowed down his recovery, and caused

financial hardship to him and his family.  None of what he claims in this suit is for damages

related to what he is claiming in the DBA claim.

### Christine Holguin-Luge

138.     Christine Holguin-Luge worked for defendants KBR from September

2009 until May 1, 2011.  She worked as a Document Control Manager at the United States

Embassy grounds in Camp Prosperity in Baghdad, Iraq from April of 2010 until July of 2010.  In

2009, Plaintiff started working at the Service Desk at Tal Afar beginning on October 1, 2009.

After that, Plaintiff went in February for two months or so, to a Service Desk near Mosul and

shut down KBR's service desk there, and was promoted to work at the Embassy at Camp

Prosperity in Baghdad in April of 2010.  In Baghdad, she worked for the materials department

which did all of the receiving for the embassy, food, and documents, anything having to be

archived with the government from all bases in Iraq, UAE, and back and forth to Houston to

KBR's headquarters.  This work was done under a Department of State Contract.  Beginning in

September of 2010, Plaintiff went to work for Defendants in Tikrit as an Airfield Trainer (ATO

mission) until May 1, 2011.  The real employer was KBR, and SEII was imposed unilaterally as

an offshore ruse to avoid paying taxes.  KBR recruited, trained her in their Houston offices,

entered into the government contracts under which all work was performed and payment made,

and employed Plaintiff and controlled the functions of the employees such as Plaintiff.

139.     In Camp Prosperity, Defendants KBR employed Defendant Khudairi

Trading and Contracting Company (KTCC) as a subcontractor to provide Iraqi workers in the

Warehouse under Plaintiff.  One such employee, Ali Al Asad, from Baghdad, had been with

KBR for five years, working as a forklift driver in the receiving yard, and as a warehouseman.

He was approximately 25 years old and was a body builder, about six feet tall, and much heavier

and more muscular than Plaintiff.  He worked under Plaintiff's supervision.

140.    On June 25, 2010, at around 1 p.m. Baghdad time, Plaintiff had just returned from

Rest and Recreation (R&R) and was supposed to turn in her Kevlar equipment.  Her 45th

birthday was only four days away.  Mr. Asad was her driver and was needed to drive her to her

trailer where she lived to pick up the Kevlar equipment that was too heavy for her to lift and

carry to the warehouse.

141.    Mr. Asad drove her to her dwelling.  She looked back and saw him follow her to

the hallway of her trailer and told him to go back to the vehicle and wait for her.  KBR had just

recently made Camp Prosperity part of the Embassy Grounds.  It was now United States Soil.

However, there was no security or protection for workers, no fencing around their dwellings.

This in spite of KBR's assertion there was 100% security.  Had there been a security perimeter

around the trailers (FOB), with a gate as in other places, this could not have happened.  In fact, it

had been on their list of things to do, put up a security perimeter and fence and gate around the

trailers, but Defendant KBR did not get around to it.   As a result, Mr. Asad was able to gain

access to her trailer complex.  Plaintiff turned around and by the time she got to her trailer and

opened her locked door, Mr. Asad was standing behind her and shoved her forcibly into her

trailer and closed the door behind her.

142.    Mr. Asad proceeded to sexually assault Plaintiff Holguin-Luge by throwing her

on her bed, and throwing the Kevlar in the doorway at her, injuring her chest and arm, causing bursting of capillaries and bruising on her chest and arm.

143.    He threatened her life and demanded to have sexual intercourse.  Plaintiff screamed repeatedly, but nobody came to her assistance.  He kept telling her she was beautiful and that he loved her, trying to rip her clothes off, telling her the things he was going to do to her.  Mr. Asad pulled out his sex organ and tried to touch her, told her she was going to die.  He also told her he knew he was going to die, so why not carry through with the rape.

144.    This ordeal lasted the better part of an hour.  During this time, Plaintiff was in great fear for her life, felt helpless, shocked, traumatized, and knew she was going to die a gruesome death and be humiliated and raped.

145.    Plaintiff tried to talk him out of carrying through with the rape and murder by explaining that if he did this, the military would chase him down and have him killed.  After she promised to say nothing to anyone of the incident, he eventually stopped and left her trailer but before he left he said she would die if she said anything.

146.    She left her trailer after waiting for Mr. Asad to leave the grounds, and encountered a male co-worker who asked her if she were all right, indicating he had heard the commotion in her trailer.

147.    Plaintiff waited a couple of days to report because of her fear for her life.  She reported it, and the Army Criminal Investigative Division (CID) investigated it, arrested Mr. Asad, interrogated him and determined he admitted what he did.  The Army verified Mr. Asad had sexually assaulted Plaintiff.

148.     Defendant KBR told Plaintiff she would be protected from Mr. Asad, but they allowed him access to her work area after she reported him.  Defendant KBR began treating Plaintiff differently, having her followed, intimidated her and altered her work conditions.  Other managers spoke with her and implied she was at fault in the sexual assault and implied she was wrong to report it.  Eventually, KBR had the employer of Mr. Asad, Defendant Khahdairi Trading (KTTC)

149.     Because of the trauma she experienced, Plaintiff began to experience nightmares, withdrawal and other effects of her stress and injury.  She continued to fear for her life.  Shortly after the incident, Defendant put in a security fence around the trailers where she lived.

150.     In addition to intimidation, Defendant KBR engaged in conduct to intensify Plaintiff's difficulty, her feelings of alienation and depression, confusion, stress, and harm, such as refusing to collect evidence such as fingerprints, falsely telling Plaintiff that one could not collect fingerprints in the desert climate due to temperatures.

151.     Later, when CID conducted the investigation, it did collect Mr. Asad's fingerprints from Plaintiff's quarters in the trailer, including the harmed necklace Mr. Asad tore off of her neck, her torn shirt and other items corroborating her reports of sexual assault.

152.     Plaintiff demanded to be allowed to report the sexual assault and attempted rape to the authorities in Baghdad to have Mr. Asad brought to justice.  Defendant KBR stood in her way, preventing her from going to downtown Baghdad to make the report, telling her she would have to have Army escort because it was too dangerous but failing to provide or procure such escort.

153.     Defendant burst into her office at one point and removed her cell phone and computer from her in response to Plaintiff's reporting of the assault and continued insistence on bringing the incident to light and trying to bring her attacker to justice.  Defendant KBR retaliated against her  and refused to pay for counseling or medical or other DBA benefits.

154.     Others were assaulted sexually in the employ of KBR, and on information and belief, Defendant KBR covered them up, and intimidated victimsKBR.  KBR Halliburton flew someone from Brussels to fly back with her to Texas, and this employee took her to her door in Texas, watching her the whole way.  She was not even allowed to go to the bathroom by herself.

155.     After returning to the United States in July 2010, Plaintiff obtained counseling. She paid for her own medical expenses, some $3,000.   Defendant took $3,000 for an airplane flight back to the United States after paying for it.  Plaintiff wanted to return to work for Defendant in another location with a different job.  She felt she could improve things by working so long as she was away from Camp Prosperity where the people and events that had tormented her would not be present.  In July of 2010, she was assigned to Tikrit and became an Airfield Trainer.

156.     Defendant's intimidation continued toward Plaintiff in Tikrit.  She was watched by KBR and the military personnel there constantly.  She was blackballed, made to feel she was worthless, unworthy to be an employee.  People she had never met knew her name and would call out to her.  She was made to feel as if she were a perpetrator for having reported the crime.

157.     At one point in Tikrit, Defendant KBR personnel took her into the

bay of a car wash and tried to convince her to drop her pursuit of the sexual assault case, telling her to accept DBA workers compensation benefits and leave it at that.

158.    Plaintiff's father died while she was in Iraq.  She went back for the funeral, and returned to Tikrit in October 2010.  Because of her continued exposure to the conditions in Iraq and being followed, and stressed by mistreatment by Defendant and the intimidation and weight of ostracism and being made to feel she was the wrongdoer, Plaintiff had a nervous breakdown and was sent to Dubai.  The head KBR medic, Oscar, escorted her to Dubai, tried to get her to drop her pursuit of the matter, just take your DBA benefit.  When in Dubai, Plaintiff was put on tranquilizers.  The psychiatrist diagnosed her with PTSD.  The Army doctor downgraded the diagnosis to Acute Stress Disorder (ASD).

159.    Plaintiff Luge returned to the United States for good at the end of April 2011, disabled from returning to Iraq or from work.  She has tried to find employment but is unable. She has continuing nightmares, difficulty sleeping, fears for her safety, and is under the care of a psychiatrist.

160.    AIG refused to pay for her care and treatment, refused to pay any disability payments under the DBA, denying in writing that the matter was work related to the Department of Labor in 2011.  They claimed that even though she was on duty at the time the assault occurred, and that her nervous breakdown occurred while she was on duty in Tikrit for Defendant, that it was not work related.

161.    As a result of KBR's and AIG's actions, retaliation, withholding of

37

medical, psychiatric, and disability payments, and other improper actions, they have inflicted

injuries on Ms. Holguin-Luge, worsening her psychological, physical and emotional and

financial conditions.  These actions were done to harm her and prevent revelation of the

conditions in Iraq.  Ms. Holguin-Luge does not seek any amounts compensable under the DBA

in this action.

### Nicky Pool

(against Continental Insurance Company dba CNA Global Ins. Co.)

162.    Nicky Pool of Guardian Medical was engaged by CNA Global Insurance to be the

nurse manager for Daniel Brink in South Africa to administer Mr. Brink's medical needs,

organize medical providers, engage the services of doctors, hospitals, physical therapy specialists

and suppliers for Mr. Brink's catastrophic injuries in his workers compensation case from the

explosion of an IED in Iraq, which included loss of a leg, and several fingers, multiple shrapnel

injuries, TBI, PTSD, loss of a testicle, hormonal imbalance and other conditions that required

round the clock care, wheelchair, many medical supplies and multiple doctors and numerous

operations and ongoing debridements and other planned operations.

163.    Beginning in 2007, Ms. Pool and her business under the name of Guardian

Medical was authorized by CNA through its agents and representatives in Chicago, Illinois and

elsewhere, to provide for Mr. Brink's care and to provide daily nursing services and nurse case

management services in South Africa due to the complexity of Mr. Brink's injuries in Iraq in the

explosion.

164.    Ms. Pool sent regular invoices for services she provided, and for the services,

supplies and medical providers whom she engaged to care for Mr. Brink's various needs from hospitalizations, wound care, operations, therapy, and transportation and medical supplies.

165.    CNA paid some of those invoices.  At one point, CNA stopped paying invoices. Ms. Pool asked them for payment and justification for non-payment.  She was given no explanations and continued to be authorized to provide for Mr. Brink's care.

166.    Over the next year, Ms. Pool incurred over $150,000 in medical bills from doctors, hospitals, and her own services for nursing at all hours, which CNA has refused to pay. She watched as this refusal caused Mr. Brink to lose medical attention and be refused medical care.  Hospitals and doctors began to blackball or exclude Mr. Brink.  As a result, she watched as he deteriorated and suffered immensely.  She provided much care for him in spite of non payment because of his dire circumstances, which were caused by CNA refusing to pay invoices.

167.    Medical companies and service providers began collection actions against Mr. Brink and he was thrown out of his home and lost his property.  They began actions against Ms. Pool and her company as well.

168.    At no time did CNA ever say Ms. Pool or Guardian Medical was not the authorized nurse or case manager for Mr. Brink in South Africa. Had they not authorized Ms. Pool to act in that capacity or told her she could not incur expenses, she would not have done so.

169.    In order to resolve all outstanding invoices and get Mr. Brink's care back on track, in 2007 Ms. Pool spoke with Donna Spraggs of CNA and her supervisor.  They agreed to have Ms. Pool come to America with Mr. Brink to straighten out all existing amounts owing to Guardian and to other medical providers.  CNA invited her and Mr. Brink to come to America, to

the CNA Insurance office headquarters in Chicago, Illinois to meet and resolve the invoices and

Mr. Brink's medical situation.

170.    At great expense to herself, and at great expense and physical trouble to Mr. Brink

who was in a wheelchair, they traveled to America and brought all the invoices and records with

them to meet with CNA in Chicago.

171.     When they arrived at the offices of CNA Global, CNA turned them away and

would not let them come up to their offices.  They had to turn around and leave.

172.    Over the next several years, Ms. Pool tried to get CNA to settle accounts, and

CNA acted as if they would pay, but they never have.

173.    As a direct result of this, Ms. Pool has been blackballed by most of the medical

providers in South Africa, has had her business reputation and credit ruined and has not been

paid, with finance charges and interest, in excess of $200,000.00, together with out of pocket

expenses, and loss of business opportunities for the last several years.  She has also suffered

great pain and suffering and anguish from the fraud and misrepresentation of CNA and

DynCorp.

## CLAIMS FOR RELIEF

### Class Claims

174.    Plaintiffs Kreesha and Alsaleh bring this action on behalf of themselves and the

following Class:

> a.  All Americans who worked for Global Linguist Solutions or its subsidiaries, in
> Iraq and Afghanistan who had injuries under the DBA that disabled them from
> working, and who have qualified disabilities under the ADA, who were subject to
> GLS's policy of letting them go from work and refusing to rehire, reasonably

40

  accommodate their disabilities, and who could perform the essential functions of the job as translator and advisor to GLS with or without reasonable accommodation.

  b. All current and future individuals who worked for GLS and who require accommodations of job restructuring or extended medical leave to be accommodated in from January 1, 2009, to the present.

  175. All of the complaints of these individuals who worked for GLS satisfy the requirements of Fed.R.Civ.P. 23 for (1) numerosity, because there are hundreds of such claims nationally, (2) commonality of fact and law, as they all fall under the DBA and other United States laws regarding injuries on foreign bases, and have or had qualified disabilities and were subject to a unified policy not to rehire those with disabilities, refusing to reasonably accommodate their disabilities; (3) typicality, in that the claims of Plaintiffs are typical of the complaints of the class concerning ADA violations; and (4) adequacy of representation, in that Plaintiffs are experienced with the problems of these claims and have fought through difficult cases and know many of the people who are injured, and class counsel is competent to handle these claims for individuals to adequately and properly prosecute the claims of those nationally and internationally. The certification of a class or classes is superior to other methods of prosecuting these claims for fairly and efficiently bringing these matters.

**COUNT I**
(Americans with Disabilities Act Against Defendant Contractors – Plaintiff Clark, Kreesha, and Alsaleh, and those similarly situated)

  176. Plaintiffs repeats and incorporates by reference each and every allegation set out in paragraphs 1 through 175 as if set out fully herein, concerning the plaintiffs' conditions, mistreatment and failure to reasonably accommodate them.

  177. Plaintiffs Clark, Kreesha and Alsaleh, are persons with disabilities who can

41

perform jobs with reasonable accommodation have disabilities within the meaning of the

Americans with Disabilities Act (ADA), under 42 U.S.C. § 12112(b)(5)(A), 12111(8), can

perform the essential functions of their job or a restructured job with or without reasonable

accommodation.

178.   Plaintiffs Harbee Kreesha, Merlin Clark, and Mason Alsaleh were qualified

individuals with disabilities who could work with reasonable accommodations at the time of

their discharge.

179.    Plaintiff Harbee Kreesha has numerous medical conditions including

leishmaniasis, neuropathy, ulcers, sores, leg pain, colitis, and veinous insufficiency, as well as

psychiatric conditions including Post Traumatic Stress Disorder, Major Depression and Anger

problems, all of which affected and affect major life functions of working, sitting, standing,

breathing, and sleeping, and prevented him from working in his usual occupation of

translator/advisor in Iraq, and prevented him from working in his usual occupation of

translator/advisor in Iraq.

180.   Kreesha was  able to perform the essential functions of a translator, with or

without reasonable accommodations, and to do translations from home or remotely with

restructuring had he not been terminated by GLS, and later to translate in the United States,

where GLS had jobs that were similar to the one he was performing in Iraq.

181.   He has physical or mental impairments that substantially limit one or more of the

major life activities of working, sleeping, thinking, concentrating, breathing, and interacting with

others, as well and major bodily functions of the immune system, digestive, neurological, brain,

respiratory, circulatory, and reproductive functions, and had a record of such an impairment with

GLS; and was regarded as having such an impairment by GLS. 42 U.S.C. §12102(2).

182.     His mental and physical conditions substantially limited him in working because

he could not go back overseas to perform the work in translating and cultural advising for the

U.S. military in war zones as he had performed for several years in various war zones, because of

the physical requirements for extended hours (at least 12 if not 16 hour days), physically

demanding zones such as Iraq or Afghanistan, where his PTSD, and his leishmaniasis prevent

him from working in such environments per his doctors, and GLS was so informed but refused to

accommodate him with a domestic translation job that he was capable of performing.

183.     Plaintiff Mohsen Alsaleh has numerous medical conditions including

leishmaniasis, sores, neck and arm pain, breathing problems, lack of energy, as well as

psychiatric conditions including Post Traumatic Stress Disorder, Major Depression and Anger

problems, all of which affected and affect  major life functions of walking, working, sitting,

standing, breathing, and sleeping, and prevented him from working in his usual occupation of

translator/advisor in Iraq, but he could have done the essential functions of a translator, and

continued to do translations from home or remotely with restructuring had he not been

terminated by GLS.

184.     His mental and physical conditions substantially limited him in working because

he could not go back overseas to perform the work in translating and cultural advising for the

U.S. military in war zones as he had performed for several years in various war zones, because of

the physical requirements for extended hours (at least 12 if not 16 hour days), physically

demanding zones such as Iraq or Afghanistan, where his PTSD, and his leishmaniasis prevent him from working in such environments per his doctors, and GLS was so informed but refused to accommodate him with a domestic translation job that he was capable of doing.

185.   He has physical or mental impairments that substantially limit one or more of the major life activities of working, sleeping, thinking, concentrating, breathing, and interacting with others, as well and major bodily functions of the immune system, digestive, neurological, brain, respiratory, circulatory, and reproductive functions, and had a record of such an impairment with GLS; and was regarded as having such an impairment by GLS. 42 U.S.C. §12102(2).

186.   Plaintiff Merlin Clark has numerous medical conditions including Leishmaniasis, Infection with MDR Acinetobacter baumannii, right arm had a 99% severed ulnar nerve, multiple traumas from the blast, including to his head, hearing, hands, right arm, back, neck, drop foot, severe back and neck problems, ulnar nerve damage in his right arm, and difficulty performing basic tasks as a result.  He is right hand dominant and has trouble gripping and holding things.   Basic daily tasks, much less work,  are much more challenging for him.  He has issues with travel, due to edema in his leg, back and neck pain, range of motion, and stress.  He is at increased risk for thrombosis, clots, heart attack, and peripheral vascular disease due to the reconstruction of his leg and other multiple operations, traumatic brain injury (TBI), and psychiatric injuries and conditions including stress, depression, reliving of the incidents, PTSD, nightmares, intrusive recollections about the traumatic event, as well as withdrawal and avoidance issues, loss of concentration, memory loss, and hearing loss, all of which affected and affect  major life functions of walking, working, sitting, thinking, standing, breathing, and

sleeping, interacting with others, caring for himself, and prevented him from working in his usual occupation of EOD demining in Iraq, but he could have done the essential functions of his modified job, which he requested as a reasonable accommodation, working from home part time as a contract estimator and drafter, and could have continued to do on a part time basis from home or remotely had he not been terminated by Ronco.

187.    His mental and physical conditions substantially limited him in working because he could not go back overseas to perform the work in demining he had performed for many years in various war zones, because of the physical requirements for extended hours (at least 12 if not 16 hour days), physically demanding zones such as Africa, Iraq or Afghanistan, where his PTSD, his leishmaniasis, his physical injuries and limitations from his leg and arm injuries, prevent him from working in such environments per his doctors, and Ronco was so informed and acceded to those limitations by accommodating for 7 years and giving him a restructured job.

188.    Defendants Ronco and GLS had notice of the above disabilities, conditions and how they affected the major life functions and major bodily functions of Plaintitffs, as well as notice of requests for reasonable accommodation.

189.    He has physical or mental impairments that substantially limit one or more of the major life activities of working, caring for oneself, and interacting with others, walking, standing, lifting, bending, concentrating, and substantially limit the major functions of the immune system, digestive, neurological, sleeping, brain, respiratory, circulatory, and reproductive functions, and had a record of such an impairment with GLS; and was regarded as having such an impairment by Ronco. 42 U.S.C. §12102(2).

190.    Defendant Ronco responded to requests for reasonable accommodation by restructuring a job for Plaintiff to work part time from home and travel some to work on contracts for Ronco, until it decided it would no longer accommodate Plaintiff and fired him.

191.    Defendant GLS responded to requests by Plaintiffs Alsaleh and Kreesha by permitting them extended medical leave to recover from the effects of their injuries and conditions, and said they could continue working as translators, until they decided to refuse further accommodation and fired them after six months, and put them on a do not hire list.  Even after they were fired, Plaintiffs Kreesha and Alsaleh demanded reasonable accommodations of being kept on the employment rolls and perform translations in America, which work was available from GLS, but they were refused.

192.    Defendant Ronco fired Mr. Clark the day after it and CNA agreed to settle his workers compensation DBA claims, after having argued that because he was employed with Ronco, his disability pay should be less than a permanent total disability.  Mr. Clark has received a right to sue letter from EEOC.

193.    While Plaintiffs Kreesha and Alsaleh were recovering from leishmaniasis injuries and still being treated, and requested reasonable accommodations of the employer that they continue to be employed and permitted to continue on medical leave, but Defendant GLS terminated their employment.  Kreesha and Clark received a right to sue letter from EEOC, Alsaleh has requested a Right to Sue letter in July 2011 from the EEOC in Atlanta and has since received it since filing the Second Amended Complaint.

194.    Plaintiffs' disabilities were motivating factors in the decisions of Defendant

46

Ronco to fire Merlin Clark, of GLS to fire Mohsen Alsaleh and Harbee Kreesha, and to refuse to continue to reasonably accommodate them.

195.    The disabilities of Plaintiffs herein and similarly situated disabled persons, were motivating factors of other Defendants contractors not to offer jobs with accommodations, or to fire persons who were on the employment rolls being treated for DBA injuries, or to rehire but fail to accommodate restrictions or disabilities reasonably, or to fail to rehire individuals after their rehabilitation or retaliate against individuals who requested accommodation or made claims.

196.    Defendants also discriminated against Plaintiffs with regard to medical examinations and medical questions by asking Plaintiffs Kreesha, Alsaleh, and Clark, as well as others similarly situated about their medical and mental conditions.

197.    Defendants' conduct was extreme and outrageous, justifying an award of punitive damages.

198.    In all the actions described in this complaint, defendants acted through their agents, officers, attorneys, representatives, insurance carriers through their officers, agents, attorneys and insurance adjustors and managers, which were acting in the course and scope of employment or agency or representation for defendant contracting companies and insurance carriers, and which  defendant companies ratified all of the acts described in this complaint.

199.    With regard to Defendant Ronco/WSI, Merlin Clark: (1)  had a disability within the meaning of the ADA; (2) the defendant had notice of his disability and/or regarded him as disabled; (3) that with reasonable accommodations he could perform the essential functions of

47

his job and in fact was being reasonably accommodated by employer for 7 years; and (4) that the defendant refused to provide the requested accommodation in 2010 and fired him due to his disability.  Defendants did not engage in any good faith interactive process to explore accommodation with Plaintiffs, under 29 C.F.R. pt. 1630.

200.    With regard to Defendant GLS, Harbee Kreesha: (1)  had a disability within the meaning of the ADA; (2) the defendant had notice of his disability and/or regarded him as disabled; (3) that with reasonable accommodations he could perform the essential functions of his job; and (4) that the defendant refused to provide the requested accommodation and fired him due to his being out on medical leave due to his disability.

201.    With regard to Defendant GLS, Mohsen Alsaleh: (1)  had a disability within the meaning of the ADA; (2) the defendant had notice of his disability and/or regarded him as disabled; (3) that with reasonable accommodations he could perform the essential functions of his job; and (4) that the defendant refused to provide the requested accommodation and fired him due to his being out on medical leave due to his disability.

202.    As a direct result of Defendants' violations of the ADA, the Plaintiffs lost income, suffered emotional damages, and are entitled to recover lost income or back pay, compensatory damages, punitive damages, injunction against Defendants' continuing the behavior, reinstatement or front pay, interest and attorneys fees.

203.    GLS had a directive and policy to require inquiry into disability related questions of employees on medical leave, and had a fixed policy to terminate employees on medical leave if that leave exceeded six months.  As such, they had a company-wide policy that implemented

refusal to reasonably accommodate employees such as Kreesha and Alsaleh, regardless of whether they could perform the essential functions of the job of translator with or without reasonable accommodation.

204.    Plaintiffs Kreesha and Alsaleh are suitable to act as representatives of the class of persons who were terminated from employment by defendant GLS due to a nationwide policy, without providing reasonable accommodations for employment, restructured employment including employment in the United States, as well as individuals who were terminated in discrimination their disabilities and for exercising rights protected by the ADA and the DBA.

## COUNT II

(Outrage as to Plaintiff Bell and Holguin-Luge against KBR defendants and for Holguin Luge also Khudair Trading )

205.    Plaintiffs repeat and incorporate by reference each and every allegation set out in paragraphs 1 through 204 as if fully set out herein.

206.    Defendants intended to inflict emotional and mental distress on Plaintiffs, or knew or should have known that emotional distress was likely to result from their conduct.  They had willful intent to injure claimants and/or had a substantial certainty that injury was likely to occur to their persons and personal wellbeing.

207.    Defendants conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community, such that when a reasonable person hears the evidence, that person says, "Outrageous."

208.    The actions of the defendants were the cause of Plaintiffs' distress -- all as more

particularly and specifically pleaded in paragraphs above.

209.    Emotional and mental distress suffered by the plaintiffs was severe and of such a nature that no reasonable person could be expected to endure it.  Plaintiffs in fact experienced severe mental and emotional distress that resulted in physical and psychological symptoms requiring medical treatment.

210.    Defendant KBR had reason to expect a severe reaction from Bell, knowing his condition of PTSD might be aggravated by threats to drop his PTSD claim with two threatening individuals in suits showing up at his door from KBR headquarters.

211.    Defendant KBR knew that Holguin-Luge had suffered sexual assault and an attempted rape, and had feared for her life.  They knew that she was in a particularly vulnerable condition, and they acted with reckless disregard for her wellbeing in harassing her, and attacking her for wanting to see justice done, intimidating her on a daily basis, which made her condition worse.

212.    In all the actions described in this complaint, defendants acted through their agents, officers, attorneys, representatives, insurance carriers through their officers, agents, attorneys and insurance adjustors and managers, which were acting in the course and scope of employment or agency or representation for defendant contracting companies and insurance carriers, and which  defendant companies ratified all of the acts described in this complaint.

213.    The conduct of Defendants was wanton, willful, malicious, oppressive, intentional, fraudulent, justifying an award of punitive damages to punish this conduct and deter others from doing the same in the future.

## COUNT III

### (Assault Bell v KBR)

214.     Plaintiffs repeat and incorporate by reference each and every allegation set out in paragraphs 1 through 213 as if set forth fully herein.

215.     By coming to his home and threatening him with dropping his PTSD claim or else, the KBR agents/employees put Plaintiff Bell in apprehension or fear of imminent bodily harm.

216.      It was foreseeable that driving to the home of a person who had just claimed PTSD from his war experiences in Iraq and walking to his door in suits and threatening that he needs to drop his PTSD suit would put a person with PTSD or other psychological issues in fear of bodily harm.

217.     Plaintiff reasonably took the threats of the KBR employees/agents as threats to his body or person and feared for his body and safety.

218.     He responded by bringing out his pit bull which caused the

219.     He responded by calling the Sheriff and filling out a police report of terroristic threat.

220.      As a direct result of the threats of KBR's agents to Plaintiff, he suffered damages, including emotional distress, worsening of his PTSD symptoms, fear, and illness, and could not feel safe thereafter.

221.      The actions of KBR were reckless, expressed ill will, oppressiveness, and

demonstrated a willful disregard of the plaintiff's right, and due to their knowledge he was claiming to suffer from PTSD, had reason to believe their conduct would cause a severe reaction and would tend to aggravate the injury.  Therefore, an award of punitive damages is available.

## COUNT IV

### (Sexual Assault and battery Holguin-Luge v Khudairi Trading)

222.    Plaintiffs repeat and incorporates by reference each and every allegation set out in paragraphs 1 through 221 as if set forth fully herein.

223.    The Khudairi employee was acting in the course and scope of his employment when he sexually assaulted and battered Plaintiff Holguin-Luge.  Khudairi knew or had reason to know placing this large Iraqi man with a smaller American woman alone was highly likely to result in a sexual overture and assault.

224.    Due to the actions of the Khudairi Trading subcontractor employee, Holguin-Luge was put in fear of imminent bodily harm, and offensive touching

225.    Defendant did in fact touch Plaintiff in an offensive and unwanted manner and threatened Plaintiff's life, causing bodily harm and emotional and mental distress and injury.

226.     As a direct result of the sexual assault of Defendant Khudairi's agent Plaintiff suffered damages, including loss of income, loss of earning capacity and ability to work, emotional distress, PTSD, illness, and loss of enjoyment of life.

227.     The actions of Defendant were wanton, willful, reckless, oppressive and demonstrated a willful disregard of the plaintiff's well-being, justifying an award of punitive damages.

**COUNT V**

(Breach of Contract – Nicky Pool v. CNA)

228.    Plaintiff repeats and incorporates by reference each and every allegation set out in paragraphs 1 through 227 as if set forth fully herein.

229.     Plaintiff Nicky Pool agreed to perform nursing services and nurse case management services for Defendant Continental Insurance Company (CNA).

230.    CNA's promise to pay her for her services constituted a contract.

231.    Plaintiff performed based upon the promises of CNA to pay for the services it engaged Plaintiff to perform, and authorized her to incur debt with medical providers and medical equipment and supply companies.  Based on that promise, CNA did pay Plaintiff on some of her invoices in the amount of approximately 222,047.36 Zar (South African Rand, equivalent in 2007 to about $27,700.00 U.S.) for the period of March 2007 to October 2007, but then stopped paying her without justification or explanation and left owing 1,619,296.64 Zar, or approximately $200,000.

232.    Plaintiff Pool performed daily care services for Daniel Brink pursuant to her agreement with CNA and submitted invoices on a regular basis to CNA, which carried interest for charges that were over 30 days past due.

233.     Pool directed medical providers, including doctors' offices and hospitals to submit

billings to the agent of CNA who had authorized the incurring of these reasonable and necessary medical services to remediate the catastrophic physical injuries of Mr. Brink and to ameliorate his PTSD and TBI as well.

234.     Defendant told Pool they would pay these invoices and pay the medical providers and equipment companies.  CNA then refused to pay for them, and left Plaintiff without pay in an amount in excess of $75,000 plus interest for her services.

235.     In addition, due to their breach of contract, CNA left approximately $150,000 in unpaid medical expenses in South Africa.  As a result of this, Plaintiff Pool was blamed by the providers because she incurred the debt on behalf of Mr. Brink.  The providers blackballed her and her company from being able to continue her trade as a nurse and nurse case manager, driving her out of business.  Further since the services were provided to Mr. Brink, she watched as his wheelchair was repossessed, a mechanical wheelchair was paid for and then CNA stopped payment on the check, causing her additional problems with her business.  She saw Mr. Brink lose his house and car and be without any psychologist or psychiatrist to treat him, without any money or way to obtain medications or medical or nursing care.  She provided care for him on a humanitarian basis until she could not any longer.

236.     CNA was informed of the grave consequences to Mr. Brink and to Ms. Pool due to their failure to pay bills timely and to engage in a ruse to deny they had not paid.

237.     Plaintiff Pool had placed a deposit on another business prior to the actions of CNA driving Guardian out of business, and as a result of the breaches by CNA she lost her down payment and purchase of the new business and an additional Zar 180,000.

238.     The damages were foreseeable from the standpoint of CNA knowing that a small

nurse case manager and nursing business deprived of nearly $200,000 would lack operating

capital to meet obligations and be closed out of the business by large hospitals and doctors

offices who would not care that it was the fault of an American insurance company that they did

not collect their bills without legal action.

239.     As a direct result of the breaches by Defendant CNA, Plaintiff Pool suffered

direct damages of in excess of $75,000, as well as interest, and consequential damages of the loss

of her business.

## COUNT VI

(Tortious Breach of Covenant of Good Faith and Fair Dealing – Plaintiff Pool against CNA Ins.)

240.     Plaintiff repeats and incorporates by reference each and every allegation set out in

paragraphs 1 through 239 as if set forth fully herein.

241.     Defendant CNA owed a duty of good faith and fair dealing when it agreed to pay

Plaintiff Pool's bills and invoices, and induced her to incur large sums in medical

expenses for Daniel Brink's care.  Their delay in making payments for years, their use of

deception in withdrawing approval or pretending approval existed, causing doctors not to want to

work with Plaintiff, misrepresenting coverage to avoid paying. Additionally, their bad faith and

unfair dealing manifested itself through their pattern of knowingly denying medical devices and

services for Brink, lying to the Department of Labor about whether payments had been made, or

would be made, using obfuscation, denial, and inducing a trip to the United States for Plaintiff to

resolve the medical bills and her invoices, and turning her away with Brink at the doors of CNA

– are classic bad faith to deny the fruits of the contract it entered into with Plaintiff to provide service and incur debt.

242.     As a direct result of their bad faith conduct and breach of the covenant of good faith and fair dealing, Plaintiff has been damaged, has lost goods, lost her business, lost her reputation in the medical community, and has emotional pain and suffering, out of pocket expenses, and interest.

243.     The conduct of Defendants was wanton, willful, malicious, oppressive, intentional, fraudulent, and beyond the bounds of acceptable behavior in a civilized society, justifying an award of punitive damages to punish this conduct and deter others from doing the same in the future.

**WHEREFORE**, Plaintiffs pray that this court enter judgment against Defendants for actual damages, compensatory and consequential damages, and an additional sufficient amount in punitive damages as follows:

1.     Under COUNT I, for damages for violation of the ADA discrimination, reinstatement, back pay and interest, front pay, punitive damages, and attorneys fees;

2.     Under COUNT II, outrage for Plaintiffs Bell and Holguin-Luge against KBR, damages of emotional distress, PTSD, loss of income (back pay and front pay), loss of earning capacity, and punitive damages;

3.     Under COUNT III, for damages for assault for Plaintiff Bell, for emotional distress, worsening of PTSD, for pain and suffering, and punitive damages;

4.     Under COUNT IV, sexual assault and battery for Holguin-Luge against Khudairi

Trading Company for bodily harm, emotional damages, loss of income and earning capacity, loss of enjoyment and punitive damages;

5.     Under COUNT V, for breach of contract for Plaintiff Pool against Continental Insurance Company (CNA), for damages, out of pocket expenses, damages for invoices, interest, consequential damages of loss of her business and business reputation;

6.     Under COUNT VI, tortious breach of the covenant of good faith and fair dealing for Pool against Continental Insurance Company (CNA), damages of amount of her invoices, loss of her business, compensatory damages of pain and suffering for loss of business and reputation, and punitive damages;

7.     And for such other and further relief to effect substantial justice and redress the wrongs complained of herein.

Dated:  _____, 2016          Respectfully submitted,


_____/s/_____
Scott J. Bloch, Esq.
DC Bar No.  984264
LAW OFFICES OF SCOTT J. BLOCH, PA
1050 17th St., N.W.
Suite 600
Washington, DC  20036
Tel.  (202) 496-1290
Fax. (202) 478-0479
Scott@scottblochlaw.com

William J. Skepnek, Esq.
Pending admission pro hac vice
THE SKEPNEK LAW FIRM
1 Westwood Road
Lawrence, KS     66044
Telephone: (785) 856-3100

57

Fax: (785) 856-3099
bskepnek@skepneklaw.com
Counsel for Plaintiffs

Of Counsel:

Joshua Gillelan, III
Longshore Claimants' National Law Center
Georgetown Place, Suite 500
1101 30th Street, N.W.
Washington, DC 20007
(202) 625-8331
Fax: (202) 787-1920

### JURY DEMAND

Plaintiff demands trial by jury on all issues so triable as a matter of law.

_____/s/_____
Scott J. Bloch, Esq.